IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br><br><br><br> vs. <br><br><br> REMUS RON GRAY, <br><br> Defendant. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO SUPPRESS <br><br><br><br><br> Case No. 2:09-CR-664 TS |

## I.  INTRODUCTION

Custodial statements in violation of *Miranda*[1] are not admissible in the prosecutor's case in chief, but "physical evidence obtained as fruit of a voluntary statement by a defendant to a law-enforcement officer is admissible at trial regardless of whether the officer gave the defendant *Miranda* warnings."[2]  In this case, the government concedes that the officer did not give Defendant a complete *Miranda* warning, but argues that the physical evidence is nonetheless admissible because his statements were voluntary.  The Court

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] *United States v. Phillips*, 468 F.3d 1264, 1265 (10th Cir. 2006).

finds that Defendant's statements were voluntary and, therefore, the physical evidence discovered from the statements is admissible despite the officer's failure to give Defendant a complete *Miranda* warning.  However, the statements themselves are not admissible in the government's case in chief because a complete *Miranda* warning was not given.

## II. FINDINGS OF FACT

On April 9, 2009, Detective Bird (the Detective) of the Tooele County Sheriff's Office was assigned to the Tooele County Drug Task Force.  He heard that Defendant Remus Gray and another individual were in possession of firearms and were involved in a crime. The Detective had first met Defendant nine years earlier when the Detective worked at a jail where Defendant was incarcerated.  Over the following years, the Detective and Defendant developed a good rapport based on  regular, frequent, and mutually respectful encounters.  Although the Detective had not personally arrested Defendant, the Detective was familiar with his "rap sheet" and estimated that Defendant had been arrested approximately 20 times.

The Detective contacted Utah's Adult Probation and Parole (AP&P) because he knew that Defendant and the other suspect were on parole.  The Detective, together with his partner,  AP&P agents, and others decided to make contact with Defendant.  They went to an area where they thought Defendant might be located.  They observed Defendant and the other suspect driving away in the other suspect's vehicle.

Approximately 15 officers and agents conducted a felony stop of the vehicle.  A felony stop is an abrupt event, with the officers drawing their weapons and loudly demanding that the individuals exit the vehicle.  One of the officers, not the Detective,

displayed an AR15 weapon during the felony stop.  Defendant was loudly directed by name to get out of the vehicle.  He exited the vehicle and was secured in handcuffs.  Contraband was found and Defendant was arrested by the AP&P agents.   The AP&P agents requested that the Detective transport Defendant to the jail.

The Detective and his partner were in plain clothes and driving an unmarked SUV. They had their guns and badges covered with their shirts.  Because there was no divider in the SUV, Defendant was placed in the front passenger seat with his hands still cuffed behind him.   The Detective's partner, whom Defendant did not know, sat in the rear passenger seat behind the Defendant.   The Detective drove.   The Detective and his partner did not display their weapons in the SUV.

While driving toward the jail, the Detective told the Defendant what he had heard, spoke of how "they" would "work with"[3] him, and asked if Defendant would like to sit and talk before they went to the jail.  Defendant agreed.

The Detective is a known narcotics officer.  The Detective testified that moving his vehicle to a secluded area is his common practice when talking with individuals in his vehicle, especially if those individuals will be incarcerated.  Accordingly, he pulled into a bus barn, between two parked buses to talk to Defendant.  It was between 4:00 and 5:00 p.m. in the afternoon and it was still light.

Once in the SUV, Defendant correctly assumed that his conversation with the Detective was being recorded.  The Detective turned on a portable recording device when

---

[3]Tape 1, at 1:30-2:30; Tape 2, at 00:30-2:00.

they entered the SUV and subsequently handed it to the second officer.  During the interview, the device was restarted once, which created a new recording.  It is not clear what happened to restart the device, but it may have happened when it was handed to the Detective's partner in the back seat.  Defendant's testimony did not identify any part of the encounter that was missing from the two recordings.  The second recording starts while they are pulling into the bus garage and parking between two buses.  The view out of the front window was unobstructed.

Defendant testified that he trusted the Detective, felt the Detective was "straight" with him, and was comfortable talking with him.  The Detective testified that he smelled marijuana on Defendant's clothes, and while it appeared that Defendant may have been using that day, he did not appear to have any of the signs of impairment that the Detective had been trained to recognize.

When the Detective parked, he began to give Defendant a *Miranda* warning. Defendant indicated that the Detective did not need to worry about that, but the Detective insisted.  He informed Defendant of his right to remain silent, his right to have counsel present, and the right to stop answering questions at any time.  Defendant said he understood those right.  The Detective failed to inform Defendant of his complete *Miranda* rights because he did not inform him of the right to have counsel appointed if he could not afford one.

The Detective asked Defendant what happened and asked about the gun.  The Detective again encouraged him to speak with them by saying such things as "the easiest way to get you on this one, or get out of this one is to work with . . . where'd you guys do

4

this hit."[4]  The Defendant proposed that he would give up the gun if the Detective would arrange for Defendant to speak with his wife, who was then incarcerated at the jail.[5] Defendant said he guaranteed that the Detective would not be able to find the gun if there was no deal for him to meet with his wife.  The Detective explained that it would be difficult to arrange such a contact visit between prisoners at the jail.  He also explained that he would have to go directly to the Sheriff to get authorization but that he needed enough to take to the Sheriff.

The Detective eventually confirmed their agreement, then stepped out the SUV to call the Sheriff regarding Defendant's proposal.  A few minutes later he returned and told Defendant that he had gone "straight to the top,"[6]  for him and had gotten the Sheriff to agree to a visitation between Defendant and his incarcerated wife, but that visitation would have to occur in the attorney room.  The Detective asked if Defendant was "straight with that" and if the agreement was still good.  Defendant responded, "Go and get the gun right now."[7]  The Detective asked where it was and Defendant told him the location.  He directed the officers to the home where Defendant had lately been staying.[8]

---

[4]Tape 2 at 3:00-4:00.

[5]*E.g. id.* at 5:00-6:30 (Defendant offering to give the officers the gun, "but let me talk to my wife first").

[6]*Id.* at 23:00-24:00.

[7]*Id.*

[8]*Id.* at 21:00-22:00.

The Detective, his partner, and Defendant went to the house.  The Detective entered and Defendant directed him to where the gun was hidden.  The Detective retrieved the gun, all three returned to the SUV, and resumed their drive to the jail.

The entire time between the SUV turning into the bus barn and the party resuming the drive to the jail with the gun was under 35 minutes.  The officers did not raise their voices, threaten Defendant, or display weapons.  The encounter was low-key with the officers speaking in serious but casual tones.  Defendant participated freely in the conversation to the extent that he proposed and negotiated for a visit with his incarcerated wife.

As they started back to the jail, Defendant volunteered for the first time that he had not eaten for seven days, information unknown to the Detective earlier during the interview.  Learning that Defendant was hungry and knowing that dinner is served at the jail at 6:00 p.m., the Detective became concerned that Defendant would miss dinner at the jail.  The Detective told Defendant that they would swing by a local fast food restaurant's drive up window to pick up a meal, that Defendant could eat while speaking to the officers, and then could meet with his wife.

When they arrived at the jail, Defendant was led to an interview room.  The door to the room remained open.  Defendant was uncuffed to eat the fast food meal.  He and the Detective ate together while he was interviewed.  Again, the officers did not raise their voices, display weapons, or threaten Defendant.  In this encounter, as earlier, the tone of the conversation was casual.  When they were finished, Defendant was taken to meet with his wife.

6

After the gun was located, the trip for fast food, transport to the jail, the meal, and further interview were all completed in about one hour.  Thus, the entire time from the arrest to the end of his time with the Detective was approximately one and one-half hours. In addition to being recorded, the interview at the jail was also video taped.

The first tape recording is 2:55 minutes.  The second tape recording is continuous from the time the Detective began to pull into the bus barn through the conclusion of the interview in the jail.  It is one hour and 22 minutes.

### III.  DISCUSSION AND CONCLUSIONS

Because the government concedes that a complete *Miranda* warning was not given, it concedes that Defendant's statements are not admissible in its case in chief.  The government argues that the physical evidence of the gun is still admissible despite the violation because it was obtained as result of Defendant's voluntary statements.  The government also argues that because the statements were voluntary, they would be admissible to impeach Defendant's own testimony.

Defendant argues that the evidence should be suppressed because the statements that led to the evidence were involuntary.

In *United States v. Patane*,[9] the Supreme Court held "that the *Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause.  The Self-Incrimination Clause, however, is not implicated by the admission into evidence of the

[9]542 U.S. 630 (2004).

physical fruit of a voluntary statement."[10]  The government has the burden to show, by a

preponderance of the evidence, that a statement is voluntary.[11]

> "Whether a defendant's incriminating statements were made voluntarily must
> be assessed from the totality of the circumstances, looking both at the
> characteristics of the defendant and the details of the interrogation." The
> "essence of voluntariness is whether the government obtained the
> statements by physical or psychological coercion such that the defendant's
> will was overborne."  We consider the following factors in determining
> voluntariness: "(1) the age, intelligence, and education of the defendant; (2)
> the length of [any] detention; (3) the length and nature of the questioning; (4)
> whether the defendant was advised of [his or] her constitutional rights; and
> (5) whether the defendant was subjected to physical punishment."[12]

Defendant concedes that he was not subjected to physical punishment, but

contends that being held at the secluded bus barn would cause a reasonable person to

fear they might be punished.

An objective examination of the circumstances does not support Defendant's

position.  He was asked if he wanted to wanted to stop and talk somewhere before going

to the jail and expressly agreed.  Where a defendant expressly agrees to such a

suggestion, such a brief stop would not would have caused a reasonable person to fear

they might be punished.

Defendant is 29 years old, with a GED, and nothing suggests that he has limited

intelligence.  The Court finds that Defendant "was not unusually susceptible to coercion

---

[10]*Id.* at 636.

[11]*United States v. Pettigrew*, 468 F.3d 626 (10th Cir. 2006).

[12]*United States v. Cordova*, 340 Fed.Appx. 427, 433–434 (10th Cir. 2009)
(quoting  *United States v. Rith*, 164 F.3d 1323, 1333 (10th Cir. 1999) (internal quotation
marks omitted)).  The Court finds that *Cordova*, a recent unpublished case, is
persuasive as it involves some of the same issues in this case.

because of his age or lack of education or intelligence."[13]  While Defendant had been using drugs that day, and smelled of marijuana, there was nothing in his appearance or actions to indicate to the experienced officer that he was impaired.  He tracked the conversation, was "lucid and responsive to questioning,"[14] and subsequently remembers the conversation.

The length of the questioning leading to the gun was very short and was held at a location away from the officers who had conducted the felony stop.  In the first few minutes of that brief conversation, Defendant proposed the bargain.  By the time 35 minutes had elapsed, the gun had been retrieved and the SUV was proceeding back to the jail.

Similarly, the total length of all of the questioning that resulted in all of the statements, one and one-half hours, was also relatively short.  Further, that total time did not consist of continuous questioning and did not occur in one place.  It was interrupted by the detours to the get the gun, purchase the fast food, and enter the County Jail. Questioning then resumed in a room with an open door, where Defendant was uncuffed and sat eating with the Detective in a casual atmosphere.  As before, the tone of the conversation was casual and Defendant participated freely.  Even considering the total length of the day's questioning, it was nowhere near excessively long.

The nature of the questioning was serious, but not intimidating.  Instead, the officers' tone and language intimate a "we're-trying-to-work-with-you" attitude.

---

[13]*United States v. Chalan*, 812 F.2d 1302, 1308 (10th Cir. 1987).

[14]*United States v. Toles*, 297 F.3d 959, 966 (10th Cir. 2002) (finding Defendant's statements were freely and voluntarily given).

Defendant argues that the Detective's rather disjointed statement: "the easiest way to get you on this one, or get out of this one, is to work with. . . " was an improper inducement that overbore his will.  The Court determines whether an action is a promise of leniency by examining whether the Detective's actions, taken on a whole, amount to a promise of leniency.[15]  In the present case, the Court finds that they do not.  Instead, the statement is a continuation of the Detective's general encouragement to Defendant that "they" would "work with" him if he cooperated.  There is no promise, or even any mention, of any specific action by the prosecution.  These statements are the type of "limited assurances" which have been held to be a "permissible interrogation tactic[s]," rather than a promise that would "critically impair a defendant's capacity for self-determination."[16]

Defendant also contends that the promise that he could see his wife was a promise that caused his will to be overborne.  The evidence is that it was Defendant who initiated the subject of seeing his wife and proposed the exchange of the weapon for a visit.  The Detective merely agreed with Defendant to arrange with the Sheriff for permission to provide what Defendant had requested.

---

[15]*Cordova*, 340 Fed. Appx. at 434.

[16]*United States v. Lewis*, 24 F.3d 79, 82 (10th Cir. 1994) (quoting *United States v. Lopez*, 437 F.3d 1059, 1065 (10th Cir. 2006) and *United States v. Perdue*, 8 F.3d 1455, 1466-67 (1993)).

This is not a case like *Hayes v. Washington*,[17] relied upon by Defendant.  In *Hayes*, the police held a defendant incommunicado for 16 hours, refused his repeated requests to allow him to call his wife or an attorney, and told him he could not do so until after he cooperated—meaning after he signed a confession.

In this case, because Defendant's wife was herself incarcerated, her own ability to communicate with Defendant was curtailed.  Thus, the incarceration that rendered her unavailable to aid, assist, or counsel Defendant was independent of the Detective's questioning.  The officers never in any way indicated to Defendant that his wife could receive any benefit or detriment in her own case as a result of Defendant's actions or inactions.  From the tape recording, it is clear that the reasons that Defendant thought it important to speak with his wife related to his personal marital situation.[18]

Defendant did not seek, nor was he denied, the ability to speak with any other non-incarcerated person such as other family members or friends who would have been able to provide aid and assistance.  Similarly, he did not ask for a lawyer, although he understood his right to have one present.  Thus, this is not a situation where Defendant's will was overborne by the denial of the right to speak to an available family member or friend.

In short, Defendant's own spontaneous offer to provide the gun and speak to officers in exchange for the officers arranging a brief visit with a fellow prisoner does not

---

[17]373 U.S. 503 (1963).

[18]*E.g.* Tape 2 at 22:30–23:05.

render his statements involuntary as coerced merely because that other prisoner is his spouse.

While Defendant was not fully advised of all four of his *Miranda* rights, the Detective did inform Defendant of three of those rights. Significantly, Defendant was advised that he had the right to an attorney and the right to stop answering questions at any time and said he understood those rights.

Based on the totality of the circumstances, the Court finds that the government has met its burden of showing that Defendant's statements, though given in violation of *Miranda*, were voluntary. Because the statements were voluntary, the prosecution may use the physical evidence obtained as a result of those statements.

Further, the rule is that "the prosecution is still permitted to use statements taken in violation of *Miranda* for impeachment purposes on cross-examination."[19]   Therefore, because the Court has found that the statements were voluntary, the government is correct that it may use the statements for impeachment.[20]

## IV.  ORDER

Based on the foregoing, it is

---

[19]*Pettigrew*, 468 F.3d 626 (10th Cir. 2006) (citing *Oregon v. Elstad*, 470 U.S. 298, 306 (1985)).

[20]*Patane*, 542 U.S. at 639 (explaining that "statements taken without *Miranda* warnings (though not actually compelled) can be used to impeach a defendant's testimony at trial, though the fruits of actually compelled testimony cannot") (citing *Elstad*, 470 U.S. at 307-08; *Harris v. New York*, 401 U.S. 222 (1971); and *New Jersey v. Portash*, 440 U.S. 450, 458-59 (1979)).

12

ORDERED that Defendant's Motion to Suppress (Docket No. 18) is GRANTED in part and his statements may not be used in the government's case in chief. It is further

ORDERED that Defendant's Motion to Suppress (Docket No. 18) is OTHERWISE DENIED as follows: (1) the physical evidence obtained as a result of those statements is admissible; and (2) Defendant's voluntary statements may be used for impeachment purposes on cross-examination.  It is further

ORDERED that the Court will set a brief status conference as soon as possible to re-schedule the jury trial.  According to the Court's calculation, 37 days of speedy trial time have been used as of the date of this order.  Counsel should be prepared at the status conference to address how soon they can be prepared for the trial.

DATED   February 16th 2010.

BY THE COURT:

_____
TED STEWART
United States District Judge

.